IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **BERTA KATHERINE LEBRON, in her personal and capacity and in representation of her minor child, S.K.L.L.;  LUISA DE PEÑA OZORIA DE SÁNCHEZ; BERTA BAEZ DE PEÑA;** | CIVIL NO. 16-2607<br><br>JURY TRIAL DEMANDED |
| Plaintiff, | |
| v. | |
| **AMERICA CRUISE FERRIES, INC.; BAJA FERRIES USA; BAJA FERRIES S.A. de C.V.; STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD; THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA); THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED;** | |
| Defendants. | |

## COMPLAINT

**TO THE HONORABLE COURT:**

NOW COMES the Plaintiff, **Berta Katherine Lebrón, in her personal and capacity and in representation of her minor child, S.K.L.L.;  Luisa De Peña Ozoria De Sánchez; Berta Baez De Peña;** through the undersigned attorneys and respectfully alleges and prays as follows:

1

## I. INTRODUCTION

1.     This is a federal question action filed by plaintiffs to redress her injuries suffered due to the intentional and/or negligent acts committed by defendants, related to a chain of negligent acts occurred between August 16 and August 17, 2016.

## II.    JURISDICTION AND VENUE

2.     This Court has Admiralty and Maritime Jurisdiction and the claim in within the meaning of Fed. R. Civ. P.9 (h). Admiralty and Maritime Jurisdiction is based upon 28 U.S.C. §1331 and 28 USC §1333.

3.     Moreover, the jurisdiction in this case is also founded pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between co-Plaintiffs, **Berta Katherine Lebrón, in her personal and capacity and in representation of her minor child, S.K.L.L.; Luisa De Peña Ozoria De Sánchez, (residents of Dominican Republic and Panamá)** and Defendant, a corporation registered and with place of business in Puerto Rico. Furthermore, the amount in controversy in the Complaint exclusive of interests and costs exceeds seventy five thousand dollars ($75,000.00).

4.     Venue of this action in this district is proper pursuant to 28 U.S.C. Sec. 1391 (b), since the incident occurred on the navigable waters of the United States in connection with traditional maritime activity such as ferrying passengers from the Dominican Republic to Puerto Rico aboard the M/V

2

Caribbean Fantasy (herein "Ferry") and/or since defendant consented to be sued in PR Federal Court pursuant to Admiralty and Maritime law.

### III.   REQUEST FOR JURY TRIAL

5.   Plaintiff requests trial by jury.

### IV.   PARTIES

6.   Plaintiff **Berta Katherine Lebrón, in her personal and capacity and in representation of her minor child, S.K.L.L.**, *[herein "Lebrón"]* of legal age, is single and resident of Panamá City, Panamá, with the following address: Jardín Olímpico #2, Calle Israel #D146, Panamá, Panamá Republic. SKLL was born on July 16, 2013 and lives with her mother in Panamá (herein "SKLL").

7.   Plaintiff, **Luisa De Peña Ozoria De Sánchez,** is an elder woman of 90 years and resident of Calle Salvador Espinal Miranda #1, Edificio Santa Fe Apt 2B, Mirador Norte, Distrito Nacional, Santo Domingo, Dominican Republic.

8.   Plaintiff, **Berta Báez De Peña,** is single, of legal age, and resident of Calle Dos Hermanos 274, Apartamento 3, San Juan, PR 00907 (herein "Báez")

9.   Defendant **AMERICA CRUISE FERRIES**, **INC.** (herein "ACF") is a corporation duly registered and authorized by the state of Puerto Rico with principal offices in Concordia 249, Mayaguez, PR 00680. Their Resident Agent is: Néstor González García, located at Concordia 249, Mayaguez, PR 00680.

10.    Defendant **BAJA FERRIES USA** (herein "BAJA FERRIES") is a corporation duly registered and authorized by the state of Miami, Florida with principal offices in 2601 S Bayshore Dr # 1110, Miami, FL 33133, USA.

11.    Defendant **BAJA FERRIES S.A. de C.V.** (herein "BAJA FERRIES") is a corporation duly registered and authorized in Mexico, with the following location: Ignacio Allende 1025, Zona Central, 23000 La Paz, B.C.S., Mexico.

12.    Codefendant **STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which would cover liabilities and personal injuries occasioned to crewmembers working aboard the vessel **Caribbean Fantasy.** Steamship Mutual Management (Bermuda) Ltd address is as follows "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

13.    Codefendant **THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA)**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the vessel **Caribbean**

4

**Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which would cover liabilities and personal injuries occasioned to crewmembers working aboard the vessel **Caribbean Fantasy.** Said codefendant's address is as follows "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

14. Codefendant **THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION (BERMUDA) LIMITED**, [hereinafter "P&I"] was and still is a liability insurer incorporated in the Bahamas, who had issued and maintained in full force and effect, at the time of the injury and damages as alleged throughout this Complaint, a policy of liability insurance issued to Baja Ferries SA de CV and/or Baja Ferries USA and/or ACF and/or to the vessel **Caribbean Fantasy**, covering all risks for injuries and accidents that would occur on and within said vessels, and specifically, which would cover liabilities and personal injuries occasioned to crewmembers working aboard the vessel **Caribbean Fantasy.** Said codefendant's address is as follows "Washington Mall II, Unit 416 22, Church Street, PO BOX HM 601, Hamilton, HM, CX, Bermuda".

## V.    STATEMENT OF CLAIM

### a. Information regarding M/V Caribbean Fantasy (herein "The Ferry")

15. At all relevant times ACF managed the vessel known as **M/V CARIBBEAN FANTASY**.

16. At all relevant times ACF operated the vessel known as **M/V CARIBBEAN FANTASY**.

5

17.    At all relevant times ACF lease the vessel known as **M/V CARIBBEAN FANTASY**.

18.    At all relevant times BAJA FERRIES owned the vessel known as **M/V CARIBBEAN FANTASY**.

19.    At all relevant times BAJA FERRIES provides maintenance to the vessel known as **M/V CARIBBEAN FANTASY**.

**b. The incidents**

20.    SKLL is Lebron's daughter. Lebron is Baez' daughter. Baez is Peña's daughter.

21.    Baez suffers from diabetes. She injects insulin and has high blood pressure.

22.    Peña was born in November 25, 1925, is a 90 years old woman who is blind from one eye, has high pressure, has a heart murmur and barely walks, reason why she is in need of a wheel chair.

23.    Lebrón lives in Panamá together with SKLL and her fiance, Mr. Gilbert Manuel Ledezma Ho. Since her fiance was traveling abroad, Lebrón decided to take a trip to Puerto Rico and the Dominican Republic for her vacations.

24.    On July 31, 2016, Lebrón, SKLL and Baez traveled to Santo Domingo, Dominican Republic, where they met with Peña.

25.    While in Dominican Republic, Plaintiffs spent great time together with their family.

26.    On August 13, 2016, Baez bought tickets for plaintiffs.

6

27.    They booked a stateroom with four beds.

28.    The Ferry carried approximately 512 passengers/crewmembers.

29.    Before boarding Plaintiffs requested a wheel chair for Peña since she is disabled.

30.    Plaintiffs boarded on August 16, 2016, at 5pm, and at between 7pm-8pm the Ferry departed.

31.    The Ferry did not depart timely since they had mechanical and/or technical problems.

32.    Peña boarded the Ferry on wheel chair.

33.    Plaintiffs had traveled before with the Ferry and the air conditioner was always working.

34.    However during this voyage, Plaintiffs noted there was no good air circulation on the common areas and at the stateroom the air conditioner was not working at all.

35.    Thus, Plaintiffs notified defendants of such deficiencies.

36.    Defendants informed that they had knowledge of the lack of air conditioner and for that reason they gave Plaintiffs one floor fan for the whole stateroom.

37.    Due to the high temperatures at the stateroom, Peña lay at the floor.

38.    Plaintiffs could not sleep during the whole night due to high temperatures in the staterooms.

39.     At approximately 6.30am, Plaintiffs were at the lobby returning the room key.

40.     Approximately at 7am, while awaiting at the lobby, a young man, came to Plaintiffs stating that the Ferry was burning.

41.     Approximately at 7:00 a.m. of August 17, 2016, Plaintiffs noticed that there was a fire onboard, which was out of control and defendants instructed passengers to walk to the bow.

42.     Since the elevators were not working and there were no special assistance to disable people, two crewmembers helped Peña from the lobby to the bow.

43.     While at the bow, they saw a chaotic scene, since people were hysterical, screaming, pushing each other, shouting and some of them even jumped overboard from the life rafts to the ocean.

44.     While waiting at the bow, Plaintiffs started inhaling smoke generating from the fire onboard the Ferry.

45.     Due to the fire onboard, the Ferry's crewmembers instructed Plaintiffs to evacuate the Ferry.

46.     Crewmembers stated that the first ones that will board the life rafts were minors, mothers and elders.

47.     After that announcement, SKLL and Lebrón did not see Baez and Peña until afternoon hours (Peña) and night hours (Báez).

**c. SKLL and Lebrón's events while separated from Peña and Baez.**

48.     After struggling, pushing and yelling to Lebrón that tried to access the life raft, the latter and SKLL entered the life raft.

49.     Three crewmembers pushed a person that tried to have access to the life raft instead of Lebrón and SKLL.

50.     Lebrón and SKLL waited approximately one hour for the life raft to get down since the life raft got stuck.

51.     While descending to the water, once again it got stuck the life raft, and it started hitting the Ferry.

52.     Because the life raft didn't have seat belt, she had to hold SKLL, who was sitting on her legs, really tight and had to put all the pressure in her legs, back and arms to avoid SKLL falling or injuring herself with every hit the life raft made to the Ferry. They were sitting in the middle and the paddles of the life raft that people were grabbing to hold on, located in the ceiling, fell on Lebron's head.

53.     Lebrón had a feeling that the life raft would break in any time.

54.     The passengers aboard the life raft were desperate and it almost tip over the life raft.

55.     No seat belt was available at the life raft.

56.     At the life raft there was nowhere to hang on and SKLL had to be on Lebrón legs, graving her.

57.     Thus while onboard the life raft she had the feeling that she could fall into the ocean anytime.

58.     The life raft was not prepared for this emergency.

59.     Once the life raft reached the Ocean, it was already broke and water began accessing the life raft.

60.     Despite being on the ocean, the life raft continue striking with the Ferry since no effort was made to get away the ferry.

61.     The motor of the life raft wasn't working properly making it almost impossible to get away from the Ferry, until eventually it stop working completely, causing the raft to keep striking the Ferry.

62.     SKLL vomited several times while on life raft. SKLL was screaming, crying and in deep pain.

63.     Approximately after one hour and a half of thinking that the life raft will sink in any moment, finally the USCG arrived.

64.     At that moment, a woman went overboard and into the ocean.

65.     SKLL and Lebrón waited approximately 45 minutes while the USCG tied their vessel to the life raft.

66.     While Lebrón trying to transfer SKLL to the USCG's vessel, a passenger got desperate and tried to take SKLL place.

67.     Once SKLL was onboard the USCG's vessel, Lebrón had to wait until they transfer other passenger.

68.     During those endless minutes, Lebrón could not see SKLL.

69.     Once Lebrón was transferred to USCG's vessel and saw her daughter was "safe", she decompensated, started vomiting and crying without control.

10

70.     Once arrived to the terminal Lebrón and SKLL started desperately searching for Peña and Baez and nobody knew their location, until finally a member of the Red Cross informed that Báez was taken to a hospital on an ambulance without further details.

71.     No medical attention was provided to Lebrón and SKLL.

72.     Lebrón was extremely anxious, felt dehydrated and weak.

73.     While searching for her mother and grandmother, Lebrón thought that something happened to them.

74.     Lebrón and SKLL finally met with Peña at approximately 4pm.

75.     The three of them, starting crying and hugging.

76.     Lebrón was informed that her mother was at the Hospital receiving medical treatment due to dehydration and a nervous breakdown.

77.     Time after, Lebrón, SKLL and Peña were taken to Baez' house.

78.     While there, SKLL continued vomiting.

79.     After, Lebrón administrated SKLL bendryl, pedialite and hydrated her.

80.     The next day, Lebrón took SKLL to the pediatrician, Dr. Edna Zayas, who prescribed zantac.

81.     Dr. Jorge Lebrón Mulero provided medical attention to Lebrón and found her vomiting, with high temperature and with a strong back pain specially in the upper and lower back.

82.     SKLL and Lebrón were not authorized to take their luggage.

11

83.    Lebrón's luggage had: her engagement ring, one hard discs, make up, two ipads, products of personal hygiene, one laptop, her watch, clothes and shoes, among others.

84.    At present, Lebrón continues with pain throughout their body, with sporadic nausea, post-traumatic stress disorder, nightmares, fear of the sea, anxiety, among others.

85.    SKLL is not sleeping alone anymore due recurrent nightmares.

**d. Baez and Peña's events while separated from SKLL and Lebrón**

86.    As previously stated, Báez and Peña stayed together, once SKLL and Lebrón were ordered to board the life raft.

87.    Even though the crew members informed that the second vessel will be for elders, Báez had to shout and beg to have access to this second raft.

88.    They waited almost an hour to have access to this second raft.

89.    Peña and Báez were ordered to leave their luggage at the Ferry. Peña's luggage contained all her prescription pills, among others.

90.    While descending on the life rafts, the raft got stuck between (approximately) decks 3-4.

91.    The cables that were using to descend the raft were not working well.

92.    The smoke from the fire was so intense that they were uninterruptedly inhaling it.

93.    Baez and Peña started vomiting and felt dizzy while Peña's blood pressure started dropping.

94.    Other passengers vomited Baez and Peña.

95.    Baez and Peña became impregnated not only with their vomit, but with that of the passengers onboard the raft.

96.    While being unstable in the air, the life raft crashed several times with the Ferry.

97.    The life raft's door broke while said raft crashed into the ferry.

98.    Baez and Peña spent approximately between 3 to 4 hours on the life raft while in the air.

99.    Baez and Peña thought they would die in each time the life raft crashed into the Ferry.

100.   Once the USCG rescue vessel arrived and since the life raft could not descend to the ocean, Baez and Peña jumped from the life raft to the USCG's rescue vessel, where three USCG's crewmembers catch them.

101.   Once arrived to the terminal, the paramedics administered Baez a serum and immediately was taken by an ambulance to the Hospital HIMA in Caguas.

102.   Baez lost consciousness.

103.   While at the Hospital, Báez was administered with IV Fluids, oxygen and also prescribed her several medications for her headache and stomach ache.

104.   Between 8 and 9 pm, Baez arrived to her home to see her granddaughter, SKLL, vomiting, her daughter extremely depressed and sad and her mother feeling dizzy and nauseous.

13

105.  Peña had several episodes of diarrhea and felt extremely dizzy.

106.  On August 18, 2016, Dr. Amilcar Torres Figueroa prescribed Peña pills for her high blood pressure and to control her diarrhea. Because Peña did not have her medicationes she started to feel dizzy because her blood pressure was dropping.

107.  Baez had to work on August 18, 2016, but requested a leave until August 24, 2016, when she attended work.

108.  On August 21, 2016, Baez had an episode of vomit and high temperature.

109.  On August 24, 2016, Baez only worked half day since her mother and she were not feeling well.

110.  On August 24, 2016, Dr. Torres attended Peña, once again, and administered new prescription pills for her high blood pressure, B12 injections and some medication for her stomach.

111.  At present, Baez and Peña continues with pain throughout their body, with sporadic nausea, post traumatic stress disorder,  nightmares, fear of the sea, anxiety, among others.

112.  Such injuries occurred as a proximate result of the unsafe, negligent and unseaworthy condition of the vessel operated by Defendant.

113.  She has met with internal medicine doctors which have diagnosed her with damages to her back.

14

**FIRST CAUSE OF ACTION – NEGLIGENCE**

114.  The allegations contained all in previous paragraphs are re-alleged as if fully alleged herein.

115.  The Ferry was built in 1989 in Japan, and is Baja Ferries property.

116.  The Ferry's flag is from Panamá.

117.  The Ferry do commercial activities between Dominican Republic and Puerto Rico such as ferrying passengers.

118.  Between 2011 and 2015, the US Coast Guard found at least 107 security deficiencies, which most of the them (approximately 44) were related to the fire system.

119.  Some of those deficiencies were related to the incorrect operating of the fire screen doors, which usually were not able to be close and/or were reported as open when they were close.

120.  On an October 16, 2014, Inspection made by the USCG stated that the "inflatable liferafts used in conjunction with MES shall comply with the requirements of Section 4-2. The liferafts 4, 13,17,18 &24 were found with the painter lines falling off the liferaft line storage pockets".

121.  A January 2015 inspection made by the United States Coast Guard ("herein "USCG") stated that oil fuel lines should be screened or protected in some way to avoid any pray or leakage onto ignition sources.

122.  Specifically in April 17, 2015, the USCG stated that the "fire screen doors shall be capable of closing at an angle of inclination of up to 3.5 degrees. The following double leaf doors were found out of sequencing and prevents the

15

doors from closing" and that "all waste receptables shall be constructed of non combustible materials. Waste receptacles located on upper deck (open) were found to be plastic".

123.   During the past 36 months, USCG's inspections of the Ferries had led to detentions.

124.   In October, 2015, the Ferry was detained in San Juan for three days by the U.S. Coast Guard for three deficiencies related: fire safety measures (international shore connection); crew certificates (certificates of competency) and ship's certificates and documents (safety manning document).

125.   Other warnings provided by the US Coast Guard were that the fire extinguishers were not working well.

126.   The US Coast Guard found deficiencies on the ceiling sprinklers that stop the flames.

127.   Between March and July 2016, the Ferry underwent maintenance work at Europe.

128.   Even though defendants informed the public that they would start operating on July 1, 2016, they were unable to provide ferrying service to passengers since the Ferry was still in Europe receiving maintenance.

129.   In July 2016, while refueling the Ferry at Port of Gibraltar, prior to continuing across the Atlantic to Puerto Rico, the Ferry was detained for six days and related to deficiencies related to the auxiliary engines.

130.   After the alleged repairs at the Port of Gibraltar, the Ferry continued its voyage to Puerto Rico.

131.   While in their voyage, the Ferry's engines failed.

132.   The ferry was unable to continue their voyage for approximately a day.

133.   Due to said mechanical failure, the Ferry changed its voyage and travel to Santo Domingo, Dominican Republic.

134.   At the Santo Domingo's Port, the Ferry allegedly repaired the engine.

135.   Early August, 2016, the Ferry arrived at the Port of San Juan, Puerto Rico.

136.   During the USCG inspection, they determined that one of three life rafts were working.

137.   A USCG inspection early August 2016, found four deficiencies related to fire safety measures and one related to the propulsion and auxiliary machinery.

138.   During August 17, 2016's emergency, the Ferry's life rafts and sliding were not working properly and/or were not properly installed.

139.   Two of the three life rafts were not working well.

140.   One life raft got stuck while descending.

141.   The second life raft, got stuck while descending to the ocean and when it reached the ocean its engines failed.

142.   This second life raft, was rescued by other vessel and/or vessels.

143.  During the voyage from Santo Domingo to San Juan, and while Plaintiff was onboard the Ferry, the air conditioner was not working well and/or was not working at all.

144.  Such was an indication of mechanical and/or electrical failure.

145.  Due to information and/or belief the Fire started at 7.15 am at the machinery room.

146. The Fire at the Ferry started when the Ferry was near the Thermoelectric in Levittown, PR.

147.  Defendants lack of repair and/or failure to provide proper maintenance to the Ferry and/or failure to properly and immediately repair the deficiencies informed by the USCG on their report dated August 17, 2016, among others, provoked the fire inside the Ferry.

148. Plaintiff's damages were a direct consequence of defendants' negligence by:  (i) failing to provide a safe ferry; (ii) failing to protect the passengers; (iii) failing to maintain safe premises; (d) failing to provide adequate emergency instructions; (iv) by failing to hire adequate personnel which were not well trained and/or had lack of knowledge on emergency proceedings and/or had lack of knowledge on descending life rafts; (v) by failing to repair and/or properly repair the engine, electric and/or propulsion defects; (vi) Defendants knew or should have known of the Ferry's mechanical, electrical and/or propulsion defects and did not repair it and/or failed to properly repair them; (vii)  Defendants' breached their duty of care to Plaintiff to the extent they failed to properly maintain properly working the life rafts and other safety

18

equipment; (viii)   defendant provoked Plaintiff unnecessary delay in the evacuation of the Ferry; (ix) failed to cancel the voyage despite knowing that the vessel was not properly working; (x) the Ferry was operated knowing was unseaworthy due to the defective engines, life rafts, electricity, air conditioners, emergency equipment and procedures.

149.   Due to the abovementioned, defendants failed to comply with the general maritime and admiralty law of the United States and with the Art. 1802 and 1803 of the PR Civil Code.

150.   Defendants actions and omissions, through fault and/or negligence, caused damages to Plaintiff, in violation of Art. 1802 and 1803 of the PR Civil Code and General Maritime Law entitling plaintiff to damages caused as a result of those acts and omissions.

151.   Defendants are jointly liable against Plaintiff.

152.   Defendants' negligence and/or intentional acts were a proximate legal cause of Plaintiff's injury.

153.   On the other hand, as previously mentioned, on August 13, 2016, Baez bought the tickets for the voyage departing on August 16, 2016 from Santo Domingo, Dominican Republic, to Puerto Rico.

154.   Baez was the only one who signed the "Confirmation Reservation". The reservation number was 310464.

155.   Baez paid the total amount of $424.90 and included a stateroom of 4 beds.

156.  In view that Plaintiffs were unable to enjoy the Ferry and the Ferry was unable to reach the Port that was hired, then Defendants shall reimburse Plaintiff Báez the total amount of $424.90.

## SECOND CAUSE OF ACTION – UNSEAWORTHINESS

157.  The allegations contained all in previous paragraphs are realleged as if fully alleged herein.

158.  Defendants maintained an unsafe place for plaintiff and exposed them to danger while ferrying passengers with a Ferry with serious engine, electricity and propulsion defects and also with the life rafts, mechanical and technical defects, and with lack of maintenance to the Ferry, as abovementioned.

159.  The vessel was unseaworthy and defendants' failed to repair the dangerous situation.

160.  Plaintiffs injuries occurred as a proximate result of the unsafe and unseaworthy condition of the vessel, which was managed, operated and/or maintained by defendants. In addition, said injuries were caused in whole, as a proximate result of negligence on the part of the Defendants, its agents, servants and/or employees.

## THIRD CAUSE OF ACTION AGAINST THE P&I CLUB

161.  The foregoing paragraphs are realleged and reasserted herein.

162.  Co-defendants **STEAMSHIP MUTUAL MANAGEMENT (BERMUDA) LTD; THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION LIMITED (BERMUDA);   THE STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION**

**(BERMUDA) LIMITED;** is liable for the negligence, fault, legal violations and unseaworthy conditions of their insured up to the coverage limit of the certificate of entry to their benefit. Plaintiff hereby exercises their right to present a direct action against the aforementioned protection and indemnity club.

**DAMAGES**

163.  As a result of defendants' negligence and unseaworthy conditions, plaintiff SKLL suffered from dehydration, gastritis, vomits, crying spells, continues receiving medical attention and also will also receive psychiatric assistance. SKLL cannot sleep well as before the incident herein described.

164.  As a result thereof, plaintiff Baez suffered and continue suffering, post traumatic stress disorder, high temperature, unable to get close to the ocean, muscle pain, dizziness, nausea, vomit, lack of air, inhaled smoke, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, insomnia and other sleep disturbances such as nightmares, psychiatric damages, extreme panic, sadness, anxiety during the ordeal, depression, her tranquility has been seriously affected, suffered economic losses, all of which affects her daily activities, including her family life.

165. As a result thereof, plaintiff Lebrón suffered and continue suffering, post traumatic stress disorder, unable to get close to the ocean, muscle pain, dizziness, nausea, vomit, lack of air, inhaled smoke, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, insomnia and other sleep disturbances such as nightmares, psychiatric

damages, extreme panic, sadness, anxiety during the ordeal, depression, her tranquility has been seriously affected, suffered economic losses, all of which affects her daily activities, including her family life.

166.  As a result thereof, plaintiff Peña suffered and continue suffering, high blood pressure, diarrhea,  post traumatic stress disorder, unable to get close to the ocean, muscle pain, dizziness, nausea, vomit, lack of air, inhaled smoke, a sense of despair and helplessness, dehydration, a lack of interest in daily activities, insomnia and other sleep disturbances such as nightmares, psychiatric damages, extreme panic, sadness, anxiety during the ordeal, depression, her tranquility has been seriously affected, suffered economic losses, all of which affects her daily activities, including her family life.

167.  Plaintiffs damages herein alleged apply to all causes of actions.

168.  The plaintiffs are seeking and/or receiving medical treatment.

169.  As a result of the events described herein, Plaintiffs has suffered and continues to suffer irreparable physical, economical and emotional damages.

170.  Since Plaintiff Baez could not work for almost 4 days, she request an amount not less of $1,500.00 for economic losses.

**VI. RELIEF**

171.  Wherefore, plaintiffs prays that this court enter judgment in favor of plaintiffs and against defendants and award the total amount of $5,451,924.90 as follows:

a. To Plaintiff SKLL for her emotional and physical damages and pain and suffering, an amount not less than $650,000.00.

b. To Plaintiff Lebrón for her emotional and physical damages and pain and suffering, an amount not less than $1,500,000.00.

c. To Plaintiff Báez for her emotional and physical damages and pain and suffering, an amount not less than $1,500,000.00.

d. To Plaintiff Peña for her emotional and physical damages and pain and suffering, an amount not less than $1,500,000.00.

e. To Plaintiff Báez for loss of past income, as well as economic losses, an amount which is estimated at this time to be in excess of $1,924.90.

f. Punitive damages for an amount not less than $300,000.00.

g. Provide for the payment of all applicable interests, including prejudgment interest, together with reasonable attorney's fees, litigation expenses and the costs of this action.

h. Grant plaintiffs such other and further relief as the Court may deem appropriate and proper and retain jurisdiction over this action in order to assure full compliance with any decree issued by this court.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 8 day of September, 2016.

**BELLVER ESPINOSA LAW FIRM**
Condominio El Centro I, Suite 801
500 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
Tel(787) 946-5268/Fax(787)946-0062

S/Alejandro Bellver Espinosa
Alejandro Bellver Espinosa, Esq.
U.S.D.C. – P.R. 225708
Email: alejandro@bellverlaw.com

/s/ Krystal Santiago Sánchez
Krystal Santiago Sánchez, Esq.
U.S.D.C. – PR 303611
Email: krystal@bellverlaw.com